## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

FIFTH THIRD BANK, BANK OF NEW ) 
YORK MELLON, as indenture trustee, and ) CIVIL ACTION
TEXTRON BUSINESS SERVICES, INC., )
　) No. 10-2294-KHV/GLR
　　Plaintiffs, )
　)
v. )
　)
BROOKE HOLDINGS, INC., )
　)
　　Defendant. )
_____ )
　)
BROOKE HOLDINGS, INC., )
　)
　　Counter Complaint and Third-Party )
　　Complaint Plaintiff, )
v. )
　)
FIFTH THIRD BANK, BANK OF NEW )
YORK MELLON, as indenture trustee, and )
TEXTRON BUSINESS SERVICES, INC., )
　)
　　Counter Complaint Defendants, )
　)
v. )
　)
FTI CONSULTING, INC., )
　)
　　Third Party Defendant. )
_____ )

## MEMORANDUM AND ORDER

On May 21, 2010, Fifth Third Bank, Bank of New York Mellon ("BNYM") as indenture trustee

and Textron Business Services, Inc. ("TBS") brought suit against Brooke Holdings, Inc. In Count I,

plaintiffs seek a declaratory judgment that they are not liable to Brooke Holdings for their role in the

securitization of certain promissory notes. In Count II, Fifth Third seeks damages for intentional

publication of false and defamatory statements by Brooke Holdings. In response, Brooke Holdings

brings a counterclaim against plaintiffs and a third-party complaint against FTI Consulting, Inc.[1]  The

counterclaim and third-party complaint allege the same two causes of action: tortious interference with

contract and tortious interference with prospective business advantage.

This matter is before the Court on the <u>Motion of Plaintiffs To Dismiss</u> (Doc. #23) filed

September 24, 2010; <u>FTI Consulting, Inc.'s Motion To Dismiss Brooke Holdings, Inc.'s Third Party</u>

<u>Complaint</u> (Doc. #26) filed September 24, 2010;[2] and the <u>Objection To: 1) Motion Of Plaintiffs To</u>

<u>Dismiss And 2) FTI Consulting Inc.'s Motion To Dismiss Brooke Holdings, Inc.'s Third Party</u>

<u>Complaint</u> (Doc. #37) which Brooke Holdings filed November 3, 2010.  The Court construes the

objection by Brooke Holdings as a motion for leave to amend its counterclaim and third-party

complaint.  For the reasons stated below, the Court overrules both motions to dismiss as well as

defendant's motion for leave to amend.  The Court refers to Brooke Holdings, Inc. as "defendant" and

to Fifth Third Bank, BNYM and TBS collectively as "plaintiffs."  The Court refers to FTI Consulting,

Inc. as "third-party defendant."  Where appropriate, the Court will refer to plaintiffs and third-party

defendant collectively as "movants."

## Legal Standards

Movants (plaintiffs and third-party defendant FTI Consulting) ask the Court to dismiss

defendant's counterclaim and third-party complaint because defendant lacks standing and, alternatively,

because it fails to state a claim on which relief may be granted under Rule 12(b)(6), Fed. R. Civ. P.

---

[1]     FTI Consulting, Inc. is a consulting company that Brooke Corporation hired to oversee
the securitization arrangement at the center of this litigation.

[2]     FTI Consulting, Inc. requests oral argument on its motion to dismiss.  The Court
overrules its request pursuant to D. Kan. Rule 7.2, which provides that the "court ordinarily will
resolve motions on the parties' written briefs or memoranda."

**Standing**

To maintain suit in federal court, a party asserting a claim for relief must have standing to sue. Movants ask the Court to dismiss defendant's claims for lack of jurisdiction based on lack of standing, which the Court reviews under Rule 12(b)(1), Fed. R. Civ. P.[3] Rule 12(b)(1) motions generally take the form of facial attacks on the complaint or factual attacks on the accuracy of its allegations. Holt v. United States, 46 F.3d 1000, 1002-03 (10th Cir. 1995) (citing Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990)). Here, movants challenge the face of defendant's counterclaim and third-party complaint, so the Court presumes that defendant's factual allegations are accurate and does not consider evidence outside the counterclaim or complaint. Id.

The standing requirement is derived from the case or controversy requirement of Article III and focuses on whether the claimant is the proper party to bring suit. Raines v. Byrd, 521 U.S. 811, 819 (1997). To establish standing, defendant must show that (1) it has suffered an actual or threatened injury which is (2) fairly traceable to movants' unlawful conduct and (3) will likely be redressed by a favorable decision. Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2753 (2010); Robey v. Shapiro, Marianos & Cejda, L.L.C., 434 F.3d 1208, 1210-11 (10th Cir. 2006). The elements of constitutional standing are not mere pleading requirements, but are an indispensable part of defendant's case. Utah v. Babbitt, 137 F.3d 1193, 1204 (10th Cir. 1998) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)). Thus, defendant must support each element in the same way as any other matter on which it bears the burden of proof. See Lujan, 504 U.S. at 561. At this stage, defendant must plausibly allege

---

[3]     Courts consider questions of standing under Rule 12(b)(1), Fed. R. Civ. P., which governs motions to dismiss for lack of subject matter jurisdiction. Although compulsory counterclaims need not allege an independent basis for subject matter jurisdiction, the counterclaimant must have standing to bring the claim. See Murphy Oil v. Wood, 438 F.3d 1008, 1018-19 (10th Cir. 2006) (defendant lacked standing to bring counterclaim).

that it has standing.  Cf. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

## Failure to State a Claim

In ruling on movants' motions to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief. Iqbal, 129 S. Ct. at 1950.  To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible and not merely conceivable on its face. Id.; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 129 S. Ct. at 1950.

The Court need not accept as true those allegations which state only legal conclusions. See id.; Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).  Defendant bears the burden to frame its complaint with enough factual matter to suggest that it is entitled to relief; it is not enough for him to make threadbare recitals of a cause of action accompanied by mere conclusory statements. Twombly, 550 U.S. at 556.  A facially plausible claim contains factual content from which the Court can reasonably infer that movants are liable for the misconduct alleged. Iqbal, 129 S. Ct. at 1949.  This requires defendant to show more than a possibility that movants have acted unlawfully, and to plead facts that are more than "merely consistent" with liability. Id. (citing Twombly, 550 U.S. at 557).  A pleading that offers labels and conclusions, a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement will not stand. Id. Similarly, where the well pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged but not "shown" that the pleader is entitled to relief. Id. at 1950.

## Factual and Procedural Background

-4-

The following facts are taken from defendant's counterclaim and third-party complaint, and are construed in the light most favorable to it.

**Securitization Arrangement**

This case arises from a plan to securitize and sell promissory notes. Given the complicated nature of the securitization scheme, a brief description of the participants and their relationship to each other and this litigation is helpful. Defendant, Brooke Holdings, Inc., is a holding company that owned a 42 per cent stake in Brooke Corporation, a publicly-traded holding company. Doc. #14 ¶ 2. Brooke Corporation owned a 64 per cent interest in Brooke Capital Corporation and a 62 per cent share in Aleritas Capital Corporation, two publicly traded companies with independent boards of directors. Id. ¶¶ 3-4. Brooke Capital franchised insurance agencies and operated an insurance company. Id. ¶ 4. Aleritas made loans to insurance-related businesses. Id. ¶ 6. Brooke Agency Services Company, LLC ("BASC") was an independent special purpose entity created solely to hold and administer franchise agreements with independent insurance agents, collateral preservation agreements with lenders and agency sales agreements with insurance companies. Id. ¶ 5.

The securitization arrangement worked as follows: Aleritas made loans to insurance-related businesses ("borrowers"), which it usually secured with the borrowers' business assets. Id. ¶ 6. Aleritas then sold the secured promissory notes to special purpose entities. Id. The special purpose entities packaged the notes as investment securities collateralized by the collective pool of notes (commonly known as "asset-backed securities"). Id. The special purpose entities hired TBS as a third-party loan servicer. Id. ¶ 8. TBS was responsible for communicating with the borrowers about the notes, amortization, accounting, etc. Id. The special purpose entities also hired BASC to perform "collateral preservation services." Special purpose entities used collateral preservation services to mitigate loan

losses by providing marketing, operational, management and sales assistance to troubled borrowers. Id. TBS subcontracted its loan servicing responsibilities to Aleritas, and BASC subcontracted its collateral preservation responsibilities to Brooke Capital. Id. ¶ 9. When the notes were ready for sale, the special purpose entities appointed BNYM as an indentured trustee to administer the proceeds from the sale and distribute the proceeds as required by contract. Id. ¶ 10. Fifth Third purchased some of these asset-backed securities. Id.

### Collateral Preservation Services Fees

Subsequently, Fifth Third and defendant had a dispute over amounts due for collateral preservation services. Defendant claims that to artificially inflate the value of the securities which it held, Fifth Third required the special purpose entities to overuse collateral preservation services and prevented BNYM from paying for the services. Id. ¶¶ 12-14. Instead of paying for the collateral preservation services, Fifth Third and BNYM "parked" losses associated with the securities with Brooke Capital and hid the substantial payment obligations from regulators and auditors. Id. ¶ 14. In 2007, Brooke Capital reported $15,634,000 in expenses associated with collateral preservation services and reported receiving no compensation for its services. Id. ¶ 78. In 2007, Brooke Capital's operating income was $3,432,000; with collateral preservation service fees, it would have been $19,066,000. Id.

Fifth Third, BNYM, TBS and FTI Consulting induced Brooke Corporation to breach its loan agreement with defendant by delaying and avoiding payments to Brooke Capital for collateral preservation services, which set in motion the following chain of events that directly injured defendant. See id. ¶ 20. On March 31, 2008, defendant was forced to loan Brooke Corporation $12 million to cover Brooke Capital's 2007 operating cash flow deficits caused by nonpayment of collateral preservation services. Id. On October 28, 2008, notwithstanding defendant's loan, Brooke Capital collapsed and

filed for bankruptcy. See id. ¶ 81. The Brooke Capital collapse caused Aleritas to collapse, which with the collapse of Brooke Capital caused Brooke Corporation to collapse and default on defendant's loan. See id. ¶¶ 82-83. Brooke Corporation's default caused defendant to default on a commercial loan which it had used to fund the $12 million loan to Brooke Corporation.[4] See id. ¶ 137. Defendant's commercial loan was secured by its 42 per cent stake in Brooke Corporation. See id. Because defendant defaulted on its promise to repay the bank, it lost its interest in Brooke Corporation. See id. Defendant alleges that movants' joint effort to deprive Brooke Capital of fees for collateral preservation services caused it to lose the $12 million which it had loaned to Brooke Corporation (plus interest) as well as its stake in Brooke Corporation. Both Brooke Capital and Brooke Corporation are now in Chapter 7 bankruptcy proceedings.

### Fifth Third, BNYM and TBS

Defendant generally alleges that by avoiding and delaying payment to Brooke Capital for collateral preservation services, and obstructing and circumventing the proper corporate governance of publicly traded companies to continue avoiding and delaying payment, Fifth Third and BNYM tortiously interfered with repayment of its promissory note. See Doc. #14 ¶ 1. Specifically, defendant alleges that Fifth Third required special purpose entities to overuse the collateral preservation services of Brooke Capital and prevented BNYM from paying for those services. Id. ¶ 13. Defendant alleges that Fifth Third and BNYM together prevented payment by not communicating with special purpose entities regarding the fees, wrongfully challenging the amount of fees due, thwarting a deal to resolve the fee dispute, ignoring a proposal by Brooke Capital to mediate the dispute, trying to prevent Brooke Capital

---

[4]      The $12 million loan was a "re-loan" – defendant borrowed the money from a commercial bank and re-loaned it to Brooke Corporation.

from recovering its fees through baseless threats and intimidation, suing to replace Brooke Capital with a receiver, replacing the management of Brooke Capital, influencing the special master to discontinue Brooke Capital franchise agreements, funneling franchise fees to special purpose entities to cover debts that BNYM as trustee should have paid and conspiring with TBS to produce false monthly servicing reports that understated the servicing fees due. Id. ¶¶ 84-97.

Defendant further alleges that to avoid and delay paying collateral preservation servicing fees, plaintiffs interfered with the corporate governance of Brooke Capital, Aleritas and Brooke Corporation. Id. ¶ 98. Specifically, defendant alleges the following interference by Fifth Third and BNYM: hosting meetings with Brooke Capital customers and lenders for the express purpose of replacing the CEOs of Brooke Capital, Aleritas and Brooke Corporation with a receiver; initiating lawsuits to do the same; discrediting Brooke Capital management to its customers through misleading, untrue and exaggerated public allegations that damaged the reputations of Brooke Capital, Aleritas and Brooke Corporation; falsely accusing Brooke Capital management of fraud, conversion and misappropriation; communicating frequently and directly with management of Brooke Capital, Aleritas and Brooke Corporation to promote efforts by Fifth Third and BNYM to avoid and delay payments; forcing Brooke Capital to pay special purpose entities for collateral preservation services; using their leverage over Brooke Capital to require Brooke Capital, Aleritas and Brooke Corporation to hire consultants, auditors and lawyers, thus disrupting their operational routines; demanding voluminous and redundant documents from Brooke Capital, Aleritas and Brooke Corporation; and intimidating their employees. Id. ¶¶ 98-116.

Defendant further alleges that Fifth Third and BNYM tried to improperly justify their actions by blaming Brooke Capital, Aleritas and Brooke Corporation and accusing the Brooke entities of tortiously interfering with the relationship between BNYM and BASC. Defendant also alleges that TBS

helped organize a meeting of Brooke Capital lenders for the purpose of replacing its management with a receiver, id. ¶ 110, and that TBS forced Aleritas delay payment of collateral proceeds, id. ¶ 101. Fifth Third and BNYM allege that Brooke Capital did not properly perform collateral preservation duties. Id. ¶ 130.

## FTI Consulting

Defendant alleges that Fifth Third also forced Brooke Corporation to retain third-party defendant FTI Consulting to provide advisory and consulting services which Fifth Third used to avoid and delay payment of collateral preservation service fees to Brooke Capital. Doc. #14 ¶ 117. According to defendant, Fifth Third used its close and lucrative business relationship with FTI Consulting to obtain confidential information from Brooke Corporation. Id. It then tried to use this information to coerce Brooke Capital management to not require repayment of collateral preservation service fees. Id. Defendant also alleges that FTI Consulting ignored demands by Brooke Corporation to honor the confidentiality provisions of their contract, stop requesting confidential information and terminate the relationship. Id. Instead, FTI Consulting continued to request access to confidential information and threatened adverse consequences if Brooke Capital denied access. Id. ¶ 123.

Defendant alleges that FTI Consulting irreparably damaged Brooke Corporation by breaching its fiduciary duty and working against Brooke Corporation to further the interests of Fifth Third. Id. ¶ 117. Specifically, FTI Consulting produced an unauthorized audit report that contained false and misleading information and, in violation of its confidentiality agreement and specific written requests by Brooke Corporation, distributed the report to unauthorized personnel of Brooke Capital and Aleritas. Id. ¶ 124. Defendant also alleges that on behalf of Fifth Third, FTI Consulting held an unauthorized meeting with Brooke Capital management in which it falsely asserted that BASC was "out of trust" and

had violated its fiduciary duties to insurance companies. Id. ¶ 125. This caused Brooke Capital management to resign en masse, causing organizational chaos which contributed to the collapse of Brooke Capital. Id.

**Analysis**

Defendant asserts two claims: (1) tortious interference with contract and (2) tortious interference with prospective business advantage. Movants assert that defendant lacks standing to bring its counterclaim and third-party complaint and, alternatively, has not alleged sufficient facts to establish its claims.[5]

## I.    Standing

Movants argue that defendant lacks standing to bring its counterclaim and third-party complaint because their actions did not cause its alleged injury. To establish causation for purposes of Article III

---

[5]        Plaintiffs spend much of their Memorandum Of Law In Support Of Plaintiffs' Motion To Dismiss Counterclaim (Doc. #24) arguing that defendant's claims are "derivative" and therefore defendant cannot properly bring them. Plaintiffs, however, conflate the causation requirement of standing and derivative suits which enable a shareholder of a corporation to bring an action on behalf of that corporation. See Ross v. Bernhard, 396 U.S. 531, 534 (1970). Plaintiffs' discussion of direct versus derivative claims has sewn substantial confusion into this already complicated litigation. As a result, defendant's reply argues that as a shareholder of Brooke Corporation, it could assert a derivative claim. Defendant admits, however, that its complaint does not meet the derivative action pleading requirements in Rule 23.1, Fed. R. Civ. P. Doc. #37 at 12 ("Admittedly, the pleading requirements stated in Rule 23.1(b) were not satisfied . . . ."). Defendant therefore seeks leave to amend its complaint to satisfy Rule 23.1(b), Fed. R. Civ. P. It states, however, that it "does not believe that its claims are derivative." Doc. #37 at 12. Moreover, defendant's request to amend its complaints does not comply with D. Kan. Rule 15.1, which requires that a party filing a motion to amend attach a proposed amendment. The Court therefore overrules defendant's request to amend its counterclaim and third-party complaint to comply with Rule 23.1(b), Fed. R. Civ. P.

Based on its standing as a creditor and shareholder of Brooke Corporation, defendant also attempts to add a claim for aiding and abetting breach of fiduciary duty. Defendant raises this argument in its brief in opposition to a motion to dismiss, which does not amend a complaint. See Kearney v. Dimanna, 195 Fed. Appx. 717, 721 n.2 (10th Cir. 2006). Therefore, the Court does not consider defendant's aiding and abetting claim. If defendant wishes to amend its counterclaim or third-party complaint, it should file a separate motion to amend that complies with D. Kan. Rule 15.1.

standing, defendant must show that its injury is fairly traceable to movants' alleged misconduct. See Monsanto, 130 S. Ct. at 2753; Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1225 (10th Cir. 2008). The "traceability" requirement is not as strict as proximate causation, but Article III does require proof of a substantial likelihood that movants' conduct caused defendant's injury in fact. Habecker, 518 F.3d at 1225. If speculative inferences are necessary to connect defendant's injury to the challenged action, defendant has not met its burden. Id.; Nova Health Sys. v. Gandy, 416 F.3d 1149, 1157 (10th Cir. 2005). Moreover, if "the independent action of some third party not before the court" – rather than movants' conduct – directly caused defendant's harm, causation may be lacking. See Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 45 (1976); Habecker, 518 F.3d at 1225 (intervening act of voters to recall plaintiff from office deprived plaintiff of standing to sue recall committee which sponsored ballot measure that led to plaintiff's recall). That an injury is indirect does not necessarily defeat standing, though it may "make it substantially more difficult . . . to establish that, in fact, the asserted injury was the consequence of [movants'] actions." Warth v. Seldin, 422 U.S. 490, 504-05 (1975). In other words, defendant need not allege that movants' actions were "the very last step in the chain of causation," but may establish causation by showing that movants' actions had a "determinative or coercive" effect upon the action of something else, which directly caused defendant's alleged injury. Bennett v. Spear, 520 U.S. 154, 169 (1997); see also Carver v. City of New York, 621 F.3d 221, 226-27 (2d Cir. 2010) (traceability turns on degree to which movants' actions constrained or influenced decision of final actor in chain of causation).

Here, defendant argues that by conspiring to withhold payments from Brooke Capital, movants tortiously interfered with its contract with Brooke Corporation for repayment of the $12 million loan and tortiously interfered with its prospective business advantage. Defendant alleges that this act led to a

chain of events that ultimately injured it.

Specifically, defendant alleges that movants caused collateral preservation services payments to be withheld from Brooke Capital, which caused defendant to give Brooke Corporation a $12 million loan. Defendant also alleges that movants' actions caused Brooke Capital to collapse, which caused Aleritas to collapse, and that these collapses together caused Brooke Corporation to collapse and default on defendant's loan. Defendant further alleges that the default of Brooke Corporation caused defendant to default on its loan and lose the collateral that secured it – its interest in Brooke Corporation.

Movants argue that this chain of causation is too attenuated to support standing. Accepting defendant's allegations as true, as it must, the Court disagrees. Defendant need not allege that movants' conduct was the last step in the chain of causation, but must show only a substantial likelihood that movants' actions caused defendant's injury. See Bennett, 520 U.S. at 169; Habecker, 518 F.3d at 1225. Although defendant's injury is indirect, defendant has made a plausible claim that movants' actions caused defendant's injury. Defendant's counterclaim and third-party complaint plausibly allege that movants had a determinative or coercive effect on each link in the chain of events that ultimately caused its injury. Defendant alleges that but for movants' actions, defendant would not have made the $12 million loan to Brooke Corporation and that Brooke Capital would not have collapsed. Specifically, it alleges that movants' actions caused Brooke Capital, Aleritas and Brooke Corporation to collapse, which caused Brooke Corporation to default on defendant's loan and caused defendant to default on its commercial loan. Accepting defendant's factual allegations as true, and drawing all reasonable inferences in its favor, it is beyond plausible that movants had a determinative or coercive effect in causing defendant's injury.

Movants also argue that defendant's injury was caused by third parties not before the Court,

namely Brooke Capital, Aleritas, Brooke Holdings and the commercial bank. The actions of these third parties, however, were dependent upon movants' conduct. Indeed, defendant alleges that each subsequent link in the chain of causation was completely dependent upon movants' actions. The Court therefore finds that defendant has standing to bring its tortious interference claims against movants.

## II.     Failure to State a Claim

Defendant asserts the same two claims against all movants: (1) tortious interference with contract and (2) tortious interference with prospective business advantage.[6] The essential elements of tortious interference with contract are (1) a contract, (2) movants' knowledge thereof, (3) movants' intentional procurement of its breach, (4) without justification, (5) causing damages. Dickens v. Snodgrass, Dunlap & Co., 255 Kan. 164, 168-69, 872 P.2d 252, 257 (1994). The essential elements of tortious interference with prospective business advantage are (1) the existence of a business relationship or expectancy with the probability of future economic benefit to defendant; (2) movants' knowledge of the relationship or expectancy; (3) a reasonable certainty that but for movants' conduct, plaintiff would have continued the relationship or realized the expectancy; (4) intentional misconduct by movants; and (5) damages to defendant as a direct or proximate cause of movants' misconduct. Turner v. Halliburton, 240 Kan. 1, 12, 722 P.2d 1106, 1115 (1986).

Both claims require that movants acted intentionally – they must have desired the alleged interference or known that it was substantially certain to occur. Pizza Mgmt., Inc. v. Pizza Hut, Inc., 737 F. Supp. 1154, 1161 (D. Kan. 1990). The interference must also be malicious – with intent to inhibit

---

[6]     In diversity actions the Court applies the substantive law, including choice of law rules, of the forum state. See Moore v. Subaru of Am., 891 F.2d 1445, 1448 (10th Cir.1989); Klocek v. Gateway, Inc., 104 F. Supp.2d 1332, 1336 (D. Kan. 2000). The parties apply Kansas law in their briefs, and no party has asserted that another state's law should apply. The Court therefore applies Kansas law.

a contract or prospective relationship with specific intent to injure – or improper.  See Triple-I Corp. v. Hudson Assoc. Consulting, Inc., 713 F. Supp.2d 1267, 1286 (D. Kan. 2010) (malice);  Pizza Mgmt., 737 F. Supp. 1154, 1161 (D. Kan. 1990) (improper);  Turner, 240 Kan. at 12, 722 P.2d at 1115 (same).  To determine whether an interference is improper, Kansas courts rely on the following factors in the Restatement (Second) of Torts:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

Restatement (Second) of Torts § 767; Turner, 240 Kan. at 14, 722 P.2d at 1116-17.  Under these factors, "[i]f the interference is an expected incidental effect of certain actions taken for another reason, then the interference may not be improper."  Pizza Mgmt., 737 F. Supp. at 1161.

To determine whether defendant's counterclaim and third-party complaint can survive movants' motions to dismiss, the Court must examine defendant's allegations against each movant and decide whether they state a plausible claim for relief.  In general, each movant asserts that defendant fails to allege that its conduct was intentional or malicious.  Defendant argues that lack of intent or malice is an affirmative defense, and that intent and malice are not elements of its cause of action.  It is true that "not all interference in present or future contractual relations is tortious," and that a "person may be privileged or justified to interfere with contractual relations in certain situations," but the scope and nature of such privilege or justification is unsettled.  Turner, 240 Kan. at 12-13, 722 P.2d at 111-16.  Moreover, it is not clear that movants assert a privilege.  Regardless, a privilege is a type of "built-in" affirmative defense that is properly considered on a motion to dismiss.  Classic Commcn's, Inc. v. Rural Tel. Serv.

<u>Co.</u>, 956 F. Supp. 910, 916 (D. Kan. 1997). The Court may therefore dismiss defendant's tortious interference claims if it finds that defendant has failed to allege improper interference. <u>See, e.g.</u>, <u>TMJ Implants, Inc. v. Aetna, Inc.</u>, 498 F.3d 1175, 1200-01 (10th Cir. 2007) (affirming dismissal of tortious interference claims where plaintiff based claims on lawful – "not improper" – speech).

### A.    Fifth Third and BNYM

Fifth Third and BNYM challenge the sufficiency of defendant's counterclaim only with respect to whether defendant adequately alleges intentional and malicious conduct (<u>i.e.</u> element 3 of tortious interference with contract and element 4 of tortious interference with prospective business advantage). Doc. #24 at 17-18. They argue that defendant only alleges that Fifth Third and BNYM intended to artificially inflate the quality of Fifth Third asset-backed securities – not that they intended to interfere with defendant's relationship with Brooke Corporation.[7] <u>Id.</u> at 18. Defendant argues that (1) it alleged that Fifth Third and BNYM acted maliciously and (2) it need not allege that Fifth Third and BNYM intended to interfere with a particular contract or relationship, but only that they knew the interference was "substantially certain to occur." Doc. #37 at 7 (quoting <u>Pizza Mgmt.</u>, 737 F. Supp. at 1161).

Defendant's counterclaim alleges that Fifth Third and BNYM "intentionally induced Brooke [Corporation] to breach its contractual obligations" to defendant, Doc. #14 ¶ 141, and that they "intentionally engaged in misconduct that destroyed the relationship between [defendant] and Brooke [Corporation]," <u>id.</u> ¶ 147. Specifically, defendant alleges that Fifth Third and BNYM delayed and avoided payment of collateral preservation services fees to Brooke Capital "for the purpose of

---

[7]    Although Fifth Third and BNYM deny that they "knew or should have known of the March 31, 2008 promissory note between Brooke Corporation and [defendant], if indeed such a document exists," <u>Complaint</u> (Doc. #1) ¶ 23, they do not raise this argument in support of their motion to dismiss.

exaggerating the investment quality of their asset backed securities." <u>Id.</u> ¶ 14.  It also alleges that Fifth Third and BNYM acted to "conceal the true level of losses associated with the asset-backed securities, and to conceal their own conspiracy in the deception." <u>Id.</u> ¶ 18.  Defendant alleges that Fifth Third and BNYM achieved these purposes by being generally uncooperative, thwarting efforts to resolve the dispute, threatening and intimidating Brooke entities, conspiring with TBS to produce false servicing reports, undermining the corporate governance of Brooke Capital, Aleritas and Brooke Corporation, improperly obtaining confidential information and using that information to spread false and misleading allegations of fraud.

Fifth Third and BNYM arguably took these actions to inflate the value of their securities and conceal their efforts to do so – not to interfere with defendant's contractual relationship with Brooke Corporation.  <u>See</u> <u>id.</u> ¶ 14; Doc. #37 at 9.  Nevertheless, construed in the light most favorable to defendant, these allegations establish a facially plausible claim that Fifth Third and BNYM took actions which were substantially certain to cause the interference that defendant alleges – the collapse of Brooke Corporation.

Moreover, under the Restatement factors, defendant has alleged sufficient facts that Fifth Third and BNYM acted improperly, <u>i.e.</u> with malice.  The intrusive nature of their alleged actions, their alleged interest in artificially inflating the value of Fifth Third holdings at the expense of defendant's subsidiaries and the absence of any social interest in protecting this type of activity, could provide a reasonable basis for a jury to find that Fifth Third and BNYM acted improperly.  <u>See</u> Restatement (Second) of Torts § 767; <u>Turner</u>, 240 Kan. at 14, 722 P.2d at 1116-17; <u>see also</u> <u>Pizza Mgmt.</u>, 737 F. Supp. at 1161.  The Court therefore overrules plaintiffs' motion to dismiss with respect to Fifth Third and BNYM.

    **B.**    **TBS**

TBS challenges the sufficiency of defendant's counterclaim on two grounds: (1) defendant has not alleged that TBS knew of defendant's contract with Brooke Corporation or its interest in prospective business advantage based on the relationship, Doc. #25 at 5-6, and (2) defendant has not alleged that TBS acted maliciously or intentionally, Doc. #24 at 17-18.

        1.    <u>Knowledge of Contract or Prospective Business Advantage</u>

Both tortious interference with contract and tortious interference with business advantage require defendant to establish that TBS had certain knowledge. With respect to the former, plaintiff must show that TBS knew that defendant had a contract with Brooke Corporation; for the latter, defendant must show that TBS knew that defendant had an expectation of future economic advantage based on its relationship with Brooke Corporation. This knowledge may be actual or constructive. <u>See</u> <u>Petroleum Energy, Inc. v. Mid-America Petroleum, Inc.</u>, 775 F. Supp. 1420, 1429 (D. Kan. 1991).

When reciting its cause of action, defendant states that TBS "knew or should have known of the contract," Doc. #14 ¶ 140, and that it "knew" of defendant's expectation of prospective business advantage based on its relationship with Brooke Corporation, <u>id.</u> ¶ 145. As TBS notes, however, defendant's substantive allegations only allege that TBS "should have known" these things based on public SEC filings and TBS or BNYM auditing activities. <u>See</u> <u>id.</u> #14 ¶¶ 48, 69.[8] Defendant must allege that TBS had actual or constructive knowledge of defendant's contract and expectation of prospective business advantage. <u>Petroleum Energy</u>, 775 F. Supp. at 1429. Its counterclaim against TBS meets this requirement – it plausibly alleges that TBS had actual or constructive knowledge of defendant's contract

---

[8]    Defendant argues that in paragraph 22 of its complaint, TBS concedes that SEC filings disclosed the existence of defendant's contract with Brooke Corporation. Doc. #14 ¶ 69. Paragraph 22 makes no such concession, however, and paragraph 23 expressly denies that TBS knew or should have known of the contract. Doc. #1 ¶¶ 22-23.

with Brooke Corporation as well as defendant's expectation of prospective business advantage based on its relationship with Brooke Corporation. See Indy Lube Invs., L.L.C. v. Wal-Mart Stores, Inc., 199 F. Supp.2d 1114, 1124 (D. Kan. 2002).

Specifically, defendant alleges that as a third-party loan servicer, TBS played an integral role the securitization process, Doc. #14 ¶ 8, and in movants' scheme to withhold payment for collateral preservation services by producing false monthly servicing reports that understated collateral preservation servicing fees, id. ¶¶ 84-97. Defendant also alleges that TBS personnel audited Brooke Corporation, Aleritas and Brooke Capital, id. ¶ 69, and helped organize a meeting of Brooke Capital lenders for the purpose of replacing its management with a receiver, id. ¶ 110. Taking defendant's allegations together and drawing all reasonable inferences in its favor, the counterclaim plausibly alleges that TBS knew of the loan agreement and ongoing business relationship between defendant and Brooke Corporation. Defendant has therefore sufficiently pled the knowledge element of its claims.

2.    Intent

TBS argues that defendant has not alleged that it acted intentionally or with malice. Based on defendant's allegations, recited above, the counterclaim plausibly alleges that by contributing to the collapse of Brooke Corporation, TBS improperly interfered with defendant's loan agreement and ongoing business relationship with Brooke Corporation.

With respect to intent, defendant need only allege that TBS desired the alleged interference or knew that it was substantially certain to occur. Pizza Mgmt., 737 F. Supp. at 1161. Defendant plausibly does so. As to malice, the Restatement factors suggest that TBS acted improperly. See Restatement (Second) of Torts § 767; Turner, 240 Kan. at 14, 722 P.2d at 1116-17; see also Pizza Mgmt., 737 F. Supp. at 1161. For example, TBS produced false servicing reports and assisted in efforts to

undermine Brooke Corporation management. In so doing, it sought to artificially enhance the value of securities owned by Fifth Third and others at the expense of defendant's subsidiaries.

Society has no interest in protecting these actions, which in and of themselves may be actionable. See Restatement (Second) of Torts § 766B cmt. d ("If the means used is innately wrongful, predatory in character, a purpose to produce the interference may not be necessary."). Defendant therefore has sufficiently pled the "intent" element of its claims against TBS.

### C.     FTI Consulting

FTI Consulting argues that defendant's third-party complaint fails to state a claim with respect to the intent and damages elements of its tortious interference claims. Doc. #26 at 9.

####     1.     Intent

FTI Consulting argues that defendant's complaint does not allege malicious intent because it only states that the interference which FTI Consulting caused was "an incidental effect of certain actions taken for another reason" and was therefore not actionable. Id. at 10 (quoting Pizza Mgmt., 737 F. Supp. at 1161). FTI Consulting places more weight on this sentence from Pizza Management than it will bear. In whole, the sentence states as follows: "If the interference is an expected incidental effect of certain actions taken for another reason, then the interference may not be improper." Id. (emphasis added) (citing Restatement (Second) of Torts § 766B cmt. d). The Restatement (Second) of Torts § 766B, comment d notes that "[i]f the means used is innately wrongful [or] predatory in character, a purpose to produce the interference may not be necessary." Rather than relying on one sentence taken out of context, the Court must consider all the Restatement factors to determine whether defendant has plausibly alleged that FTI Consulting acted improperly. See id.; Turner, 240 Kan. at 14, 722 P.2d at 1116-17; see also Pizza Mgmt., 737 F. Supp. at 1161.

FTI Consulting argues that defendant merely alleges that FTI Consulting adversely impacted defendant's contract, not that it intentionally interfered with the contract to cause the breach. Defendant, however, alleges that FTI Consulting was an important part of movants' scheme to delay payments for collateral preservation services. Specifically, defendant alleges that FTI Consulting provided advisory and consulting services to Brooke Corporation at the behest of Fifth Third. Doc. #14 ¶ 117. Defendant further alleges that FTI Consulting used its role as consultant to gain access to confidential documents of Brooke Corporation and funnel sensitive information to Fifth Third which Fifth Third used to try to avoid repaying collateral preservation service fees. Id. FTI Consulting also ignored demands by Brooke Corporation to honor its confidentiality agreement, and ignored demands by Brooke Capital and Aleritas to stop meddling in their affairs.

Defendant alleges that FTI Consulting produced and distributed an unauthorized audit report that contained false and misleading information. Id. ¶ 124. Defendant also alleges that FTI Consulting contributed to the collapse of Brooke Capital by holding an unauthorized meeting with Brooke Capital management in which it falsely asserted that BASC was "out of trust" and had violated its fiduciary duties, which caused Brooke Capital management to resign en masse. Id. ¶ 125. The resignations caused organizational chaos at Brooke Capital which contributed to its collapse. Id. ¶ 125.

Taken together and drawing all reasonable inferences in favor of defendant, its counterclaim plausibly alleges that FTI Consulting intentionally and improperly interfered with defendant's contract and ongoing business relationship with Brooke Corporation.[9] Defendant has therefore sufficiently pled

---

[9] FTI Consulting argues that defendant fails to state a claim because it alleges only that FTI Consulting took certain actions toward Brooke Capital and other Brooke entities, but not defendant itself. This, however, is precisely the nature of a tortious interference claim – it imposes liability for interfering with a person or entity with whom defendant had a contract or expectation of

(continued...)

the "intent" element of its claims.

    2.    Damages

FTI Consulting argues that defendant has not alleged concrete facts that FTI Consulting damaged defendant by its alleged interference. With respect to damages for tortious interference with contract, defendant alleges that the actions of FTI Consulting, Fifth Third, BNYM and TBS caused Brooke Corporation to breach its loan agreement with defendant, which damaged defendant in the amount of $13,765,479 (the amount of the loan – $12 million – plus interest). Defendant also alleges that because the $12 million loan which it made to Brooke Corporation was a re-loan, the default by Brooke Corporation caused defendant to default on its commercial loan, which was secured by its interest in Brooke Corporation and Aleritas, and which it lost as a result of its default. Defendant alleges that the default caused damages in the amount of $18,014,000.

With respect to damages for tortious interference with prospective business advantage, defendant alleges that it "suffered damages in an amount to be proven at trial." Doc. #14 ¶ 148. Although defendant does not allege a specific amount of damages for this claim, it has alleged sufficient facts to show that it had an ongoing business relationship with Brooke Corporation, from which a reasonable trier of fact could infer concrete monetary damages. The Court therefore overrules FTI Consulting's motion to dismiss.

**IT IS THEREFORE ORDERED** that Motion of Plaintiffs To Dismiss (Doc. #23) filed September 24, 2010 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that FTI Consulting, Inc.'s Motion To Dismiss Brooke

---

[9](...continued)
prospective business advantage.

Holdings, Inc.'s Third Party Complaint (Doc. #26) filed September 24, 2010 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that defendant's Objection To: 1) Motion Of Plaintiffs To Dismiss And 2) FTI Consulting Inc.'s Motion To Dismiss Brooke Holdings, Inc.'s Third Party Complaint (Doc. #37) filed on November 3, 2010, which the Court construes as a motion for leave to amend, be and hereby is **OVERRULED**.

Dated this 7th day of April, 2011 at Kansas City, Kansas.

s/ Kathryn H. Vratil

KATHRYN H. VRATIL
United States District Judge